UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| GAGE BROS. CONCRETE PRODUCTS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> CINCINNATI INSURANCE COMPANY, <br><br> Defendant. | 4:19-CV-4166-LLP <br><br> **MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Gage Bros. Concrete Products, Inc. ("Gage") and Defendant Cincinnati Insurance Company ("Cincinnati"). For the following reasons, Cincinnati's Motion for Summary Judgment (Doc. 21) is denied and Gage's Motion for Summary Judgment (Doc. 16) is granted.

## BACKGROUND

### I.  Facts

Cincinnati issued commercial property insurance to Gage under Policy No. EPP 037 13 40 and with effective dates of March 1, 2019 through March 1, 2020 ("the Policy"). The Policy identifies the premises located at 4301 W. 12th Street, Sioux Falls, South Dakota 57016-0303 as an insured location and the Policy's Building and Personal Property Coverage Form (Including Special Causes of Loss), Section A. Coverage provides: "We will pay for direct "loss" to Covered Property at the "premises" caused by or resulting from any Covered Cause of Loss."  Covered Property includes Business Personal Property located in or on the building or structure described in the Declarations or in the open (or in a vehicle or portable storage unit) within 1,000 feet of the building or "premises."  The Policy defines Business Personal Property to include "Stock" which is "merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping." The Policy defines "Finished stock" to mean "stock you have manufactured, except 'stock' you have manufactured that is held for sale on the 'premises' of any retail outlet insured under this Coverage Part."  The Policy details certain Exclusions of coverage including, but not limited to, damage to Covered Property from earth movement, water, exposure to weather, weather conditions, and lost business income.

1

On April 15, 2019, a number of concrete panels ("the Concrete Panels") that Gage had manufactured at its facility suffered damage ("the Loss"). The Concrete Panels were stacked side by side on pieces of wood resting on six-foot-wide discarded concrete panels laying on the ground ("the Horizontal Panels"). (Doc. 24-6). Each Concrete Panel was supported at two locations. (Doc. 24-6). According to Cincinnati's expert, a licensed professional engineer from Forensic Experts PLLC, a Horizontal Panel upon which the Concrete Panels were resting sunk approximately 4 inches from side to side due to eccentric loading and support soil saturation resulting from heavy rains. (Doc. 24-6). This in turn caused the wood blocking to shift, and the Concrete Panel supported by the wood blocking to rotate and tip over into another panel, resulting in a domino effect. (Doc. 24-6). On that day, the ground under and adjacent to the Concrete Panels was saturated with rainwater and there was standing water present on the surface caused by an accumulation of rainwater. (Docs. 23, ¶¶ 10-12; 26, ¶¶ 10-12). The ground under and adjacent to the Concrete Panels and Horizontal Panels does not usually have standing water present on its surface. (Docs. 23, ¶ 13; 26, ¶ 13). Cincinnati acknowledges that the rain may have exacerbated and accelerated the rate at which the spring frost came out of the ground, contributing to the weakening of the surrounding soil structure. (Docs. 23, ¶ 15; 26, ¶ 15; 24-5, ¶ 13).

Gage timely reported its claim to Cincinnati and sought coverage under the Policy for the damage to the Concrete Panels. Cincinnati received notice of the claim and assigned Claim No. 3327802 to the claim ("the Claim"). Gage repaired and replaced the damaged Concrete Panels at its own cost. The total cost to Gage for repairing and replacing the Concrete Panels was $386,275. Based upon a number of Policy exclusions, Cincinnati denied coverage for the damaged Concrete Panels in correspondence dated May 20, 2019, July 1, 2019, and August 13, 2019.

## II.    Procedural History

On August 27, 2019, Gage filed a complaint in state court requesting the following relief: 1) a declaratory judgment that the Policy provided insurance coverage to Gage for its Loss and that Cincinnati had an obligation to indemnify Gage for its Loss; 2) an award of damages in an amount not less than $386,275; (3) prejudgment and post-judgment interest; (4) attorneys' fees pursuant to SDCL 58-12-3; and (5) costs and disbursements. On September 25, 2019, Cincinnati removed the case to federal court. On September 27, 2019, Cincinnati Insurance filed its Answer and Counterclaim in which it requests a judgment pursuant to 28 U.S.C. § 2201 declaring that

Cincinnati has no obligation under the Policy to pay or reimburse Gage for any amounts arising from or related to the Claim or damage to the Concrete Panels and that Cincinnati is entitled to all costs and attorneys' fees.

## DISCUSSION

Pending before the Court are cross-motions for summary judgment filed by Gage and Cincinnati. In its Motion for Summary Judgment, Cincinnati argues that the Loss falls within several exclusions of the Policy. Gage argues in opposition and in its Motion for Summary Judgment that such exclusions do not apply and asks the Court to grant its motion for summary judgment and rule as a matter of law that Cincinnati's denial of coverage was a breach of contract.

### I.     Legal Standard

When cross-motions for summary judgment are presented to the Court, the standard summary judgment principles apply with equal force. *Wright v. Keokuk County Health Center*, 399 F.Supp.2d 938, 945 (S.D. Iowa 2005). Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet this burden, the moving party must identify those portions of the record which demonstrate the absence of a genuine issue of material fact, or must show that the nonmoving party has failed to present evidence to support an element of the nonmovant's case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party has met this burden, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir.2005) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). "[T]he mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . .Instead, the dispute must be outcome determinative under prevailing law." *Id. at 910-11* (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992)).

"The filing of cross-motions does not concede the absence of a triable issue of fact. The court is bound in such cases to deny both motions if it finds . . . there is actually a genuine issue of material fact." *Jacobson v. Md. Cas. Co.*, 336 F.2d 72, 75 (8th Cir. 1964). When faced with cross-motions for summary judgment, the normal course for the trial court is to "consider each motion

separately, drawing inferences against each movant in turn." *EEOC v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 603 n.8 (1st Cir. 1995); *see also Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

   II.   Analysis

Gage has alleged in this declaratory judgment action that Cincinnati breached the terms of the Policy and wrongfully denied coverage under the Policy. At this summary judgment stage, the parties do not dispute that Gage's Claim involves Covered Property. Gage's Concrete Panels fit within the definition of Business Personal Property, which includes "Stock." "Stock" includes merchandise held for storage or for sale, raw materials and in-process or finished goods. Cincinnati has filed a counterclaim, asserting that the Policy does not provide coverage based upon a number of exclusions in the Policy. The dispute on summary judgment thus regards whether the Claim by Gage falls within one or more exclusions to coverage.

In this diversity jurisdiction case, South Dakota law governs the interpretation of the Policy. *See Secura Ins. v. Horizon Plumbing, Inc.*, 670 F.3d 857, 861 (8th Cir. 2012). The South Dakota Supreme Court has "developed special rules of construction that apply when interpreting an insurance policy." *Cornelius v. Nat'l Cas. Co.*, 813 N.W.2d 167, 169 (S.D. 2012). Courts must construe an insurance contract's language "with reference to the policy as a whole and the plain meaning and effect of its words." *Id.* "If the rules of interpretation leave a genuine uncertainty as to which of two or more meanings is correct, the policy is ambiguous." *Id.* (internal quotations and citation omitted). "If the provisions of an insurance policy are ambiguous [the Supreme Court of South Dakota applies] the rule of liberal construction in favor of the insured and strictly against the insurer." *Id.* at 170 (internal quotations and citation omitted). This approach, however, does not mean that "the court may seek out a strained or unusual meaning for the benefit of the insured." *Id.*

When, as in the present case, "an insurer invokes a contract exclusion to disallow coverage, the insurer has the burden of proving that the exclusion applies." *W. Ag. Ins. Co. v. Arbab-Azzein*, 940 N.w.2d 865, 868 (S.D. 2020) (internal quotation and citation omitted). The Court will analyze each Policy exclusion in turn, mindful of the separate inferences to be drawn in favor of each moving party.

### A. Water Exclusion

Cincinnati contends that the Policy's "Water" exclusion applies to Gage's Loss. The Water exclusion provides as follows:

**(g) Water**

**1)** Flood, meaning the partial or complete inundation of normally dry land areas due to:

**a)** The unusual or rapid accumulation or runoff of rain or surface waters from any source; or

**b)** Waves, tidal waters, tidal waves (including tsunami); or

**c)** Water from rivers, ponds, lakes, streams, or any other body of water that rises above, overflows from, or is not contained within its natural or man-made boundary;

and all whether driven by wind or not, including storm surge.

(Doc. 24-1). The Policy contains an anti-concurrent causation provision which excludes coverage for "loss" caused "directly or indirectly" by flood "Water" as that exclusion is defined under the Policy.

In support of its contention that the Water exclusion applies, Cincinnati argues that:

It is undisputed that rainwater had accumulated on the Premises saturating the ground on the date of loss. It is also undisputed that standing water had accumulated under and adjacent to the concrete panels on the day the panels tipped over. It is further undisputed that the support on which the panels rested settled into the saturated ground, causing the panels to tip over. Gage Bros. admits that the ground under and adjacent to the supports that sank into the earth is usually dry and does not usually have standing water present. The only expert to evaluate the claim opined that the supports settled into the ground because of the rain-saturated soil. Based on these undisputed and admitted facts, the damage to the concrete panels was caused by "flood" within the terms of the Water Exclusion.

(Doc. 22 at 5).

In response, Gage contends that its Loss was not caused by a "flood" as it is defined under the terms of the Policy because there was no "partial or complete inundation of normally dry land, which caused the loss." (Doc. 25 at 3). Gage argues that in interpreting the meaning of "flood," the Court should apply the definition that a reasonable person placed in the position of the insured would have understood the "flood" provision to mean. In doing so, Gage, citing to Merriam-

5

Webster's Online Dictionary, Black's Law Dictionary (11th ed. 2019)[1] and Couch on Insurance argues that the common understanding of the word "flood" is an inundation that arising from the overflow of a body of water. (Doc. 25 at 4-5). In support of its argument that the term "flood" is limited to inundations arising from the overflow of a body of water, Gage cites an example in the Policy which provides that "[a]n example of a situation to which this exclusion applies in this situation is where a dam, levee, sea-wall or other boundary or containment systems fails in whole or in part, for any reason, to contain the water." (Doc. 25 at 3). Gage argues that under the language of the Policy and this referenced "example," the Policy's Water exclusion does not apply to the Loss at issue in this case.

> The full paragraph detailing the example cited by Gage states as follows:
>
> This exclusion applies regardless of whether any of the above in Paragraphs (g)1) through (g)5) is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

(Doc. 24-1). Courts have wrestled over whether the generally accepted meaning of the term "flood" includes a distinction between naturally and artificially caused floods. *See, e.g.*, *In re Katrina Canal Breaches Litigation*, 495 F.3d 191 (5th Cir. 2007) (evaluating whether flood exclusion unambiguously excludes coverage for losses caused by an inundation of water resulting from a breached levee where the breach occurred in part because the levee was negligently designed, constructed, or maintained); *Sher v. Lafayette Ins. Co.*, 988 So.2d 186, 195 (La. 2008) (holding that the term "flood" was not limited to natural disasters and that the water that flowed through levees broken by Hurricane Katrina was a "flood" within the meaning of the flood exclusion); *Kane v. Royal Co. of Am.*, 768 P.2d 678 (Colo. 1989) (stating that damage caused when the dam broke came within the flood exclusion to the policy regardless of whether the event was

---

[1] The Court notes that the definition of "floodwater" from Black's Law Dictionary (11th ed. 2019) is as cited by Gage in its brief—"Water that escapes from a watercourse in large volumes and flows over adjoining property in no regular channel." However, the definition of "flood" in the edition of *Black's Law Dictionary* cited to by Gage is somewhat different—"An overflowing of water into an area normally dry; esp[ecially], the uncontrollable inundation by surface waters of an area that would not ordinarily be expected to be so affected."

Interestingly, other courts examining this issue, citing to previous editions of *Black's Law Dictionary*, have defined "flood" similar to the language of the Policy in this case—"an inundation of water over land not usually covered by it." *E.K.S., Inc. v. U.S. Fire Ins. Co.*, Civ. No. 1999 WL 299574, at *3 (quoting *Black's Law Dictionary* (6th ed. 1990)); *Sher v. Lafayette Ins. Co.*, 988 So.2d 186, 195 (La. Jul 7, 2008) (citing *Black's Law Dictionary* (5th ed. 1979)).

a natural event and regardless of whether there may have been third-party negligence involved in allowing the dam to fail). The Court concludes that this paragraph and the example in the Policy cited to by Gage are intended to make clear that this exclusion applies to floods caused by other than an act of nature.

Under the plain language of the Policy, events covered by this exclusion are not limited to overflows of bodies of water. Section (g)1)a) clearly provides that a flood may result from "unusual or rapid accumulation. . . of rain."[2]

Under the plain language of the Policy, a "flood" resulting from the "unusual or rapid accumulation . . . of rain" need not be a complete inundation of normally dry land areas, but may also result from a "partial" inundation of normally dry land areas. The Oxford English Dictionary defines "inundation" as "[t]he action of inundating; the fact of being inundated with water; and overflow of water; a flood." www.oed.com/view/Entry/98847?rediretedFrom=inundation& (last accessed Apr. 8, 2021). Cambridge Dictionary defines "inundation" as "a flood, or the fact of being flooded with water." www.dictionary.cambridge.org/us/dictionary/english/inundation (last accessed Apr. 8, 2021). The portion of the Policy which provides that a flood may also result from "the partial . . . inundation of normally dry land areas" is ambiguous as it is overly broad. It includes not only what would be considered a flood from a hard rain but it also includes a hard rain that results in puddles of standing water. No other definition of a flood would include puddles of standing water from a hard rain.

Given that ambiguity, the language in question must be interpreted in a manner most favorable to the insured. The pictures in the record show some puddles of standing water in a yard composed of soil. The amount of rain, over what time period the rain fell, how much the rain had accumulated, if at all beyond the puddles shown, and how that rainfall compared to similar time periods are facts not in the record. Interpreting the Policy language strictly, this is not a flood. Without even a strict interpretation, this is not an inundation nor a flood by any other definition.

---

[2] Courts, citing to dictionary definitions of the term "flood" that were not cited by Gage, have also concluded that an "average purchaser of insurance would expect the term 'flood would encompass rain-induced flood.'" *See, e.g., Kish v. Ins. Co. of N.A.*, 125 883 P.2d 308, 312 (Wash. 1994). The Court agrees that under the present policy language, there could be a rain-induced flood that would preclude coverage. However, not all rainstorms, even if heavy, produce a flood. A question in this case is whether a rainstorm produced a flood.

7

The dictionary definitions cited above equate an inundation with a flood. What then is the "partial inundation" that is also defined by the Policy as a flood? Once again, it is reaching too far to deny coverage in this case by claiming that what is shown in the pictures and otherwise in the record is a partial inundation and therefore a flood. As a result, the Court finds that the flood exclusion does not apply.

Separately, the Court does not find that section (g)4) of the Water Exclusion precludes coverage as argued by Cincinnati. (Doc. 31 at 5). Section 4) provides as follows:

> **4)** Water under the ground surface pressing on, or flowing or seeping through:
>
> **a)** Foundations, walls, floors or paved surfaces;
>
> **b)** Basements, whether paved or not; or
>
> **c)** Doors, windows or other openings.

(Doc. 24-1). The record does not show that that the damage resulted from water under the ground surface "pressing on, or flowing or seeping through" the Horizontal Panels.

### B. Earth Movement Exclusion

Cincinnati contends that coverage is also excluded under the "Earth Movement" exclusion to the Policy which provides as follows:

> **(b)** **Earth Movement**
>
> **1)** Earthquake, including tremors and aftershocks and any earth sinking, rising or shifting related to such event;
>
> **2)** Landslide, including any earth sinking, risking or shifting related to such event;
>
> **3)** Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;
>
> **4)** Earth sinking (other than "sinkhole collapse"), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.
>
> But if Earth Movement, as described in **(b)1)** through **4)** above, results in fire or explosion, we will pay for the "loss" caused by that fire or explosion.

(Doc. 24-1). The Policy contains an anti-concurrent causation provision which excludes coverage for "loss" caused "directly or indirectly" by "earth movement" as that exclusion is defined under the Policy.[3]

> In arguing that the Earth Movement exclusion bars coverage, Cincinnati argues that:
>
> It is undisputed that the platform on which the concrete panels rested sank or settled into the water-soaked ground, causing the panels to tip over. Plaintiff asserts that the thawing ground contributed to the settling and the panels tipping over. This assertion implicates the Earth Movement Exclusion. That exclusion applies to loss caused by settling due to soil conditions that includes thawing. In addition, like the Water Exclusion, the Earth Movement Exclusion applies regardless of any other cause and even if the platform sinking into the ground or the thawing of the ground only indirectly caused Plaintiff's claim.

(Doc. 22 at 7).

The court in *High Street Lofts Condominium Association, Inc. v. American Family Mutual Insurance Co.,* considered the same subparagraph 4) language and observed:

> [S]ubparagraph (4), which is somewhat of an un-grammatical maze. It begins by straightforwardly listing three verbs (technically verb-like gerunds)—"sinking," "rising," and "shifting"—each of which describes ways in which earth can move. Somewhat jarringly, the sentence then interposes a definitional term—"including"—without clearly indicating what term or terms are being defined. It proceeds to define one or more of the previous verbs with a noun phrase—"soil conditions." Because the paragraph later defines the noun phrase "soil conditions" to itself comprise "contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water underlying the ground surface," an ordinary insured attempting to understand the paragraph would simply substitute the definitional portion of the paragraph's second sentence for the term "soil conditions" in the first sentence, yielding a provision that purports to exclude coverage for "[e]arth sinking . . ., rising, or shifting including contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water underlying the ground surface. . . ."
>
> This is somewhat of an improvement, although the object being modified by "including" is still unclear. An ordinary insured might then conclude that a given unit of earth can only move in a few different dimensions: it can "sink" or

---

[3] The anti-concurrent causation clause in the Policy specifically provides:
    **b.**     **Exclusions**
        (1)     We will not pay for "loss" caused directly or indirectly by any of the following, unless otherwise provided. Such "loss is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."
(Doc. 24-1).

> "rise" relative to its neighboring units, it can "shift" either laterally or forward and backward compared to its neighbors, or it can "expand" or "contract" itself.  The remaining terms—"freezing, thawing, improperly compacted soils and the action of [subsurface] water"—describe mechanisms that would cause the earth to move, not movements themselves.  Finally, the terms "settling, cracking or other disarrangement of foundations" describe *damage* that might result when the earth moves as described.  Thus, an ordinary insured might reasonably understand the exclusion in subparagraph (4) to exclude coverage for "settling, cracking or other disarrangement of foundations" of buildings (*i.e.* damage), when that damage results from the "sinking, rising, shifting, expansion, or contraction" of earth (*i.e.* movement), when that movement is caused by "freezing, thawing, erosion, improperly compacted soil, [or] the action of [sub-surface] water" (*i.e.* cause).

821 F.Supp.2d 1235, 1241 (D. Colo. 2011).  The court in *High Street Lofts* then goes on in footnote 3 to state "[a] reasonable policy holder would understand American Family's use of the word 'includes'—soil conditions 'includes' freezing, thawing, improper compaction, and subsurface water—to be closed-ended, as American Family gives no indication that it intends to also encompass other undisclosed conditions within the definition." *Id.* at 1241 n.3.

This Court finds that in one could also more broadly read the exclusion as excluding coverage for any earth sinking (other than "sinkhole collapse"), rising or shifting, with the soil conditions listed being a non-exclusive list of some examples of soil conditions that would be exclusions.  Or, one could read the exclusion to apply to causation by one of the listed soil conditions of contraction, expansion, freezing, thawing, erosion, improperly compacted soil and that action of water under the ground surface.  Or one could reasonably read the exclusion as the court in *High Street* did to exclude coverage for settling, cracking or other disarrangement of foundations of buildings when that damage results from the sinking, rising, shifting, expansion, or contraction of earth (i.e. movement), when that movement is caused by freezing, thawing, erosion, improperly compacted soil, or the action of subsurface water.  Subsection 4) is susceptible to various readings that are not strained, but reasonable.  Subsection 4) is clearly ambiguous.  The interpretation by the court in *High Street* is a reasonable interpretation of the exclusion and it is also the most restrictive and must be the one that is used in determining the rights of the insured.

The only expert opinion concludes "[t]he settlement was due to eccentric loading of the ground panel and support soil saturation."  The parties agree that saturation came from rainwater, not subsurface water.  In addition, paragraph 15 of Cincinnati's Undisputed Statement of Material Facts states that "[t]he seasonal spring thawing of the ground may have also contributed to the

support panel sinking into the ground, but rain at least exacerbated and accelerated the rate at which the soil thawed and the soil under the support panel weakened." (Doc. 23, ¶ 15). As a result of the "may" admission as to thawing, there is a question of fact as to that causation. Under subparagraph 4), thawing is one of the bases for excluding coverage based on causation.

The next question is whether the damages fall within the exclusion for damages in subsection 4). Here, we are considering "soil conditions which cause settling, cracking, or other disarrangement of foundations or other parts of realty." Gage argues that the Earth Movement exclusion does not apply to Gage's Loss because it is limited to soil conditions that cause "settling, cracking, or other disarrangement of foundations or other realty." Gage contends that the Horizontal Panels are not a "foundation" within the plain meaning of the term.

Cincinnati disagrees. It cites to Merriam Webster's Online Dictionary which defines "foundation" as:

4. : an underlying base or support

    *especially*: the whole masonry substructure of a building

5. : a body or ground upon which something is built up or overlaid

    // a limestone *foundation*

Cincinnati argues that because the Horizontal Panels were the base upon which the panels rested, they "fall within the plain meaning of 'foundations or other parts of realty.'" (Docs. 29 at 11; 31 at 6).

The Court concludes that a person of ordinary intelligence would not reasonably find that the six-foot-wide discarded concrete supports panels resting on the ground constitute a "foundation" within the meaning of the Policy just because something is resting upon it. The Oxford English Dictionary defines "foundation" as "[t]he solid ground or base (natural or built up) on which an edifice or other structure is erected; also, the lowest part of a building, usually constructed below the ground-level." https://www.oed.com/view/Entry/73932?rskey=mN0AM7M& result=1#eid (last accessed Apr. 8, 2021). The Cambridge Dictionary defines foundation as "the structures below the surface of the ground that support a building." https://dictionary.cambridge.org/us/dictionary/english/foundation (last accessed Apr. 8, 2021).

Even if there is some ambiguity in the term, the Court is thus bound to construe the exclusion in favor of the insured and strictly against the insurer.

The Policy also does not define "realty" or "other parts of realty."  In arguing that the Horizontal Panels constitute "realty," Cincinnati cites the definition of "realty" in Merriam-Webster Dictionary—"property in buildings and land." (Doc. 29 at 11).  In truth, Merriam Webster defines "realty" as "real estate" which in turn, is defined as "property in buildings and land." https://www.merriam-webster.com/dictionary/realty (last accessed Apr. 22, 2021). The Cambridge Dictionary defines "realty" as "land or buildings that someone owns;" the Oxford English Dictionary as "real property" or "real estate." https://dictionary.cambridge.org/us/dictionary/english/realty (last accessed Apr. 22, 2021); https://www.oed.com/view/Entry/158956?rskey=cCKFKz&result=2#eid (last accessed Apr. 22, 2021).

Cincinnati's expert describes the Horizontal Panels as "horizontal sections of discarded concrete panels laying on the ground."  (Doc. 24-6).  The Court does not find that the Horizontal Panels constitute property in buildings and land, as argued by Cincinnati, real property, or real estate and thus are not "other parts of realty."

Even though the Court has identified a causation fact question which could affect coverage, the damage portion of subsection 4) is not applicable to this Loss and as a result, exclusion 4) does not apply.

### C. Exclusion for "Loss" Caused by Settling, Cracking, Shrinking, or Expansion

Cincinnati argues that the "settling" exclusion applies to the Loss in this case.  This exclusion is one of the enumerated exclusions under the heading titled "Miscellaneous Causes of Loss."  This exclusion provides as follows:

**(d)    Miscellaneous Causes of Loss**

1) Wear and tear;
2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;
3) Smog;
4) Settling, cracking, shrinking or expansion;
5) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals;

    6) Mechanical breakdown, including rupture or bursting caused by centrifugal force. . . .
    7) The following causes of loss to personal property:
        a) Marring or scratching;
        b) Except as provided in **SECTION A. COVERAGE, 4. Additional Coverages, a. Change in Temperature or Humidity** and **5. Coverage Extensions, q. Utility Services;**
            i) Dampness or dryness of atmosphere; and
            ii) Changes in or extremes of temperature.

However, if an excluded cause of loss listed in **(2)(d)1)** through **7)** results in a "specified cause of "loss" or building glass breakage, we will pay for that portion of "loss" caused by that "specified cause of loss" or building glass breakage.

(Doc. 24-1). The Miscellaneous Causes of Loss exclusion does not have an anti-concurrent cause provision. The lead-in clause to this exclusion provides that: "(2) We will not pay for 'loss' caused by or resulting from any of the following[.]" (Doc. 24-1).

Cincinnati argues that "it is undisputed that the platform and panels on them settled into the saturated ground approximately four inches, causing the concrete panels to tip over." (Doc. 29 at 13). Accordingly, Cincinnati contends that Gage's Loss falls within the Miscellaneous Loss Exception.

If one reads "Settling, cracking, shrinking or expansion" literally, there would be such a broad exclusion from coverage that it would not only subsume (b)4) Earth Movement, but would provide a far broader exclusion. As a result, this Miscellaneous Causes of Loss exclusion is commonly limited to normal, naturally occurring events such as the settling of building materials or the ground that can naturally occur with the passage of some time. *See, e.g. Winters v. Charter Oak First Ins. Co.*, 4 F.Supp.2d 1288, 1295-96 (D.N.M. 1998); *Boston Co. Real Estate Counsel, Inc. v. Home Ins. Co., Inc.*, 887 F.Supp. 369, 373 (D. Mass. 1995) (finding the settlement exclusion effective because "the damage to the building was caused by factors such as gradual soil compression and/or design defect rather than 'sudden forces.'"); *Ariston Airline & Catering Supply Co., Inc. v. Forbes*, 511 A.2d 1278, 1286 (1986) (concluding that cracking, shrinking, and building, when caused by normal settling, would not be covered, whereas that "resulting from the application of some external force" would be); *Holy Angels Academy v. Hartford Ins. Group*, 487 N.Y.S.2d 1005, 1007 (N.Y. Sup. Ct. 1985) ("[I]t is not unreasonable for an ordinary individual . . . to conclude that the policy language 'settling, cracking' contained in a paragraph beginning, 'Loss

13

caused by: wear and tear . . .' was limited in meaning to the gradual sinking of a building from the yielding of the ground under its foundation or by the natural constriction and expansion of its construction materials"); *Barash v. Ins. Co. of N.A.*, 451 N.Y.S.2d 603, 606 (N.Y. 1982) ("The implication given to the average insurance buyer is that what is excluded is the normal, gradual re-adjustment of the building materials when it occurs *in* foundations, walls, floors or ceilings."); *New Hampshire Ins. Co. v. Robertson*, 352 So.2d 1307, 1310 (Miss. 1977) (the policy "would appear to exclude loss by settling and cracking due to ordinary swelling, expansion, settling or cracking as opposed to settling or cracking cause by some other external agent (here the water leak)."); 11 Couch on Insurance § 153:69 ("[W]hen the scope of the settling exclusion is not otherwise defined or place in section regarding "wear and tear," settling, shrinking, and expansion is commonly limited to normal, naturally occurring events.").

In *Cantrell v. Farm Bureau Town & Country Ins. Co. of Mo.*, 876 S.W.2d 660 (Mo. Ct. App. 1994), the court examined a similar miscellaneous causes of loss exclusion provision.  The court stated that in examining the entire exclusions clause, a reasonable reader would understand that the clause "creates the image of natural, gradual or inherent sources of forces causing the excluded items listed in the clause." *Id.* at 663.  The court said that the list of conditions includes those caused by natural means such as: settling, cracking, shrinking, bulging or expansion of pavement, patios, wall, foundations, or floors; or conditions caused by birds, vermin, rodents, insects or domestic animals.  *Id.*  The court stated that the list also includes conditions from inherent forces such as wear and tear, marring, scratching, deterioration, inherent vice, mechanical breakdown, latent/inherent defect, rust, mold, wet or dry rot.  *Id.*  The court stated that the list also includes conditions resulting from gradual external sources such as smog and smoke from agricultural smudging or industrial operations.  *Id.*

Although not a "flood" as it is defined under the Policy language, it is undisputed that the Horizontal Panel settled into the ground not naturally over time, but as a result of soil saturation from an accumulation of rainfall during the Spring thaw.  Gage admits that standing puddles of water on the surface of the support soil were unusual.  Although read broadly, the "settling" provision could apply to settling from sudden external events, as discussed above, many courts interpreting similar miscellaneous causes of loss provisions have concluded, when examining the exclusion as a whole, that it applies to natural, gradual, or inherent sources or forces.  The Court

finds that this interpretation best accords with the plain meaning of the word "settle." Merriam Webster Dictionary and Black's Law Dictionary define "settle" to mean "to sink gradually" or "subside." https://www.merriam-webster.com/dictionary/settle?src=search-dict-box (last accessed Apr. 21, 2021); Black's Law Dictionary (11th ed. 2019); *see also* https://www.dictionary.com/browse/settle (last accessed Apr. 21, 2021). Given the ambiguity inherent in the exclusion, the Court is bound to construe it narrowly in favor of the insured. Accordingly, the Court concludes that the "settling" exclusion does not apply to bar coverage in this case.[4]

### D. Exclusion for Loss Resulting from Rain, Snow, Ice or Sleet

The Policy also excludes from coverage:

**(j) Exposure to Weather**

Rain, snow, ice or sleet to personal property in the open.

(Doc. 24-1). Cincinnati argues that "it is undisputed that rain saturated the ground under and adjacent to the platform supporting the concrete panels, which were in the open yard of the Premises. As a result of this rain, the platform supporting the panels sank into the ground, causing the panels to tip over." Cincinnati urges the Court to conclude that Gage's Loss falls within the "Exposure to Weather" exclusion because the Concrete Panels (defined as Business Personal Property under the Policy) were in the open and because damage to them resulted from the rain. (Doc. 22 at 9).

The Court concludes that under the plain meaning of the Policy language, the "Exposure to Weather" exclusion does not apply. The Oxford English dictionary defines "exposure" as "[t]he action of uncovering or leaving without shelter or defense; unsheltered or undefended condition." https://www.oed.com/view/Entry/66730?redirectedFrom=exposure#eid (last accessed Apr. 8,

---

[4] Cincinnati also argues that coverage should be excluded under this provision because the Concrete Panels "cracked" and that cracking was thus a cause of the Loss. (Doc. 31 at 11). The Court disagrees. A similar argument was rejected by the court in *Cantrell v. Farm Bureau Town & Country Ins. Co. of Mo.*, 876 S.W.2d 660 (Mo. Ct. App. 1994). There, the court concluded that a similar settling clause does not exclude "conditions resulting from or caused by an insurable event." The court stated, for example, that "an explosion could cause cracking or bulging of walls and foundations, yet the exclusion section would not give a reasonable person the notion that resulting damage in the nature of cracking or bulging would not be covered." In this case, the fact that the damage in this case was "cracking" of the Concrete Panels does not mean that the Loss is precluded from coverage regardless of the cause of the cracking.

2021). The damage to the Concrete Panels did not occur as a result of leaving the Concrete Panels "exposed" to the rain, but rather resulted from the accumulation of rainwater on the surface of the ground. Once it accumulated on the surface of the ground, the water lost is characterization as rain. *See, e.g.*, *T.H.E. Ins. Co. v. Charles Boyer Children's Trust*, 455 F.Supp.2d 284, 297 (M.D. Pa. 2006) ("Courts have consistently held that rainfall that collects outside a building and subsequently flows into that building is 'surface water' for purposes of the surface water exclusion."); *Block v. Franzen*, 79 N.W.2d 446, 450 (Neb. 1956) (defining surface waters as those which comprehend waters from rain, springs or melting snows which lie or flow on the surface of the earth); 11 Couch on Insurance §153:50 (updated Dec. 2020) ("[S]urface water is distinguished from rain by its character as water on the ground. Rain, on the other hand, has been defined as "water falling from the sky.").

### E. Weather Conditions Exclusion

Cincinnati argues that the Weather Conditions exclusion bars coverage in this case. The Weather Conditions exclusion provides as follows:

> **(3)** We will not pay for "loss" caused by or resulting from any of the following in Paragraphs **(3)(a)** through **(3)(c)**. However, if an excluded cause of loss that is listed in Paragraphs **(3)(a)** through **(3)(c)** results in a Covered Cause of Loss, we will pay for that portion of "loss" caused by that Covered Cause of Loss:
>
> **(a) Weather Conditions**
>
> Weather conditions, but this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in **SECTION A. COVERAGE, 3. Covered Causes of Loss, b. Exclusions, (1)(a)** through **(1)(h)** to produce the "loss."

(Doc. 24-1). The Policy does not define what events constitute a "weather condition." As detailed in the plain language of the Policy, the exclusion for loss due to weather conditions applies only when the weather conditions are associated with one of the following causes or events excluded from coverage in Section A. Coverage, 3. Covered Causes of Loss, b. Exclusions: (a) Ordinance of Law; (b) Earth Movement; (c) Governmental Action, (d) Nuclear Hazard, (e) Utility Services, (f) War and Military Action, (g) Water, (h) Fungi, Wet Rot, Dry Rot, and Bacteria.

Cincinnati argues that the Weather Conditions exclusion applies because the earth movement and water accumulation that produced Gage's Loss were both precipitated by the

weather conditions of rainfall and the "seasonable spring thawing of the ground." (Doc. 22 at 9). Gage does not dispute Cincinnati's assertion that either rainfall or seasonal thawing is a weather condition, but contends that this exclusion does not bar coverage because these events did not "contribute in any way with a cause or event excluded in Section A. Coverage, 3. Covered Causes of Loss, b. Exclusions, (1)(a) through (1)(h) to produce the 'loss,'" including "earth movement" or "flood."

The Court has already ruled that based on the facts in the record, the Loss is this case was not produced by either "earth movement" or a "flood" as these perils are defined under the Policy. Because a weather condition did not combine with either of these exclusions to produce the Loss, the Court concludes that the "weather conditions" exclusion does not bar coverage in this case.

### F. Loss Caused by or Resulting from Damage to "Finished Stock"

A Special Exclusion applies specifically to preclude Business Income coverage for any "loss" caused by or resulting from damage or destruction of "finished stock" or the time required to reproduce "finished stock." Cincinnati argues that to the extent Gage seeks to recover lost business income under the Policy, the Special Exclusion precludes coverage for such loss. (Doc. 22 at 10). The Court will not address the merits of this argument since Gage made clear in its opposition brief that it was not seeking damages for lost business income, (Doc. 25 at 14).

In sum, the Court concludes that none of the Policy exclusions raised by Cincinnati preclude coverage for Gage's Loss.

Accordingly, it is hereby ORDERED that Cincinnati's Motion for Summary Judgment (Doc. 21) is DENIED and Gage's Motion for Summary Judgment (Doc. 16) is GRANTED.

Dated this 23rd day of April, 2021.

BY THE COURT:

_____
Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

_____